UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

Case # 16-CR-41-FPG

DECISION AND ORDER

LAURENCE SAVEDOFF,
                Defendant.

## INTRODUCTION

In July 2018, Defendant Laurence Savedoff pleaded guilty to one count of misprision of a felony, in violation of 18 U.S.C. § 4. ECF No. 212. In April 2019, the Court sentenced Savedoff to a term of imprisonment of four months and ordered that he make restitution to the victims—in an amount to be determined—pursuant to 18 U.S.C. § 3663A. *See* ECF No. 268 at 7. The Court held a restitution hearing in July 2019. Having considered the evidence and the parties' submissions, the Court orders restitution in the amounts described below.

## LEGAL STANDARD

"The Mandatory Victims Restitution Act ('MVRA'), 18 U.S.C. § 3663A, is one of several federal statutes empowering courts to impose restitution obligations on criminal defendants." *United States v. Thompson*, 792 F.3d 273, 277 (2d Cir. 2015). "[T]he MVRA makes restitution mandatory for certain categories of crimes," *id.*, and the parties agree that Savedoff's offense falls within one such category. *See* ECF No. 211 at 8; ECF No. 258 at 2; ECF No. 309 at 8. Mandatory restitution has "two statutory components: a substantive provision codified at 18 U.S.C. § 3663A, and a procedural provision codified at 18 U.S.C. § 3664." *Thompson*, 792 F.3d at 277.

Section 3663A defines "victims" for purposes of mandatory restitution and "provides a formula for calculating a defendant's restitution amount." *Id.* A victim is a "person directly and proximately harmed as a result of the commission of an offense." 18 U.S.C. § 3663A(a)(2). In

1

other words, the conduct of conviction must be the direct—*i.e.*, "but for"—cause of the putative victim's harm, and that harm must have a "sufficiently close connection to the conduct at issue." *United States v. Brown*, No. 11-CR-449, 2016 WL 11263165, at *5 (E.D.N.Y. Dec. 2, 2016).

The formula for restitution is intended to make victims whole without awarding them a windfall. *See Thompson*, 792 F.3d at 277. For that reason, "the MVRA caps the restitution award at the actual amount of the victim's loss." *Id.* (internal quotation marks omitted). "In the case of offenses involving monetary loss, that amount equals . . . the value of the property . . . less . . . the value (as of the date the property is returned) of any part of the property that is returned." *Id.* (quoting 18 U.S.C. § 3663A(b)(1)(B)). In cases of mortgage fraud, the "property" at issue is the money lent. *See Robers v. United States*, 572 U.S. 639, 642 (2014). The restitution owed to a lender is thus the amount of money lent less any money returned. *See id; Brown*, 2016 WL 11263165, at *8.

Importantly, the value of any collateral that the lender has or is entitled to receive is *not* considered for purposes of determining the restitution amount. *See Robers*, 572 U.S. at 641 ("[N]o 'part of the property' is 'returned' to the victim until the collateral is sold and the victim receives money from the sale."); *Brown*, 2016 WL 11263165, at *8 (stating that the value of "'property that is returned' is the price for which collateral is sold" and not "the market value of unsold collateral"). In other words, a court "may not base its [restitution] calculation on the market value of unsold collateral." *Brown*, 2016 WL 11263165, at *8.

"As to procedure, the MVRA provides that any restitution orders imposed under the Act must be issued and enforced in accordance with section 3664." *Thompson*, 792 F.3d at 277. Section 3664 . . . set[s] the procedures by which the sentencing court imposes the restitution order calculated under § 3663A." *Id.* at 278 (internal quotation marks and brackets omitted). Section

3664 requires a court to "order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A). Nevertheless, Section 3664 gives a court the discretion to determine the manner and schedule of payment. *See id.* § 3664(f)(2). "A restitution order may direct the defendant to make a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments." *Id.* § 3664(f)(3)(A).

It is in determining how and when a defendant should make payments that a court may consider the value of unsold collateral. A court has adequate authority to count "as part of the restitution paid[] the value of collateral previously received but not sold." *Robers*, 572 U.S. at 645; *see also United States v. Nawaz*, 572 F. App'x 24, 26 (2d Cir. 2014) (summary order) (concluding that district court properly gave defendant credit for "collateral the lenders received" but had not yet sold). In other words, the bank's receipt of collateral is deemed to be a form of "in-kind payment" for which the defendant may receive credit. *Robers*, 572 U.S. at 645; *see also* 18 U.S.C. § 3664(f)(3)(A). A defendant may not receive credit for the value of unsold collateral until the victim actually receives or liquidates it, however. *Cf. Robers*, 572 U.S. at 645; *United States v. McGinn*, 787 F.3d 116, 130-31 (2d Cir. 2015). A court values received collateral when the victim receives it, rather than some arbitrary earlier point, like the date of plea or sentencing. This serves the compensatory purpose of restitution: relying on the past value of subsequently received property would either cause incomplete restitution (if the property since decreased in value) or a windfall (if the property since increased in value). Assessing value at the time of receipt avoids these problems. *See United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006) ("In determining the appropriate measure of value for property relevant to restitution, a district court

3

must consider that the purpose of restitution is essentially compensatory: to restore a victim, to the extent money can do so, to the position he occupied before sustaining injury.").

Savedoff articulates a different framework for calculating restitution. In his view, the amount of restitution is determined by subtracting "the current fair market value" of the collateral—even if the lender has not yet received or sold it—from "the remaining amount of the loan (*i.e.*, the original loan, less payments)." ECF No. 258 at 10. This is the exact proposition that *Robers* rejected, however. The restitution amount is offset by any money the victim receives in selling the collateral, but it is not offset by the fair market value of unliquidated collateral. *Robers*, 572 U.S. at 641; *Brown*, 2016 WL 11263165, at *8.

Nevertheless, Savedoff contends that his formula is more consistent with the plea agreement, which contemplates restitution in the amount of "the loans listed [in the plea agreement], less any amount the respective financial institutions have recovered from the sale of the properties . . . or the fair market value the financial institutions *are anticipated to recover based on the future sale of the properties*." ECF No. 211 at 8 (emphasis added). Out of context, this language may support Savedoff's position. But looking at the paragraph as a whole, the Court cannot read the plea agreement in the manner Savedoff proposes. *See United States v. Hamdi*, 432 F.3d 115, 123 (2d Cir. 2005) (noting that plea agreements, like any contract, "are to be interpreted as a whole").

Savedoff essentially argues that the parties intended to fashion a restitution formula of their own design, regardless of the mandates imposed under the MVRA. The Court discerns no such intention from the plea agreement; to the contrary, the plea agreement mandates that restitution will be governed by the MVRA. *See* ECF No. 211 at 8. In light of the agreement that the MVRA would control, the Court reads the language allowing a credit for "the fair market value the

financial institutions are anticipated to recover" as a recognition that Savedoff would receive credit not only for money that lenders recovered through liquidation but also for collateral that lenders *received* but have not yet *sold*. Unlike Savedoff's reading, this interpretation is consistent with *Robers* and the MVRA. The Court proceeds accordingly.

## DISCUSSION

The parties agree that there are eight mortgage transactions for which restitution is appropriate. The Court has already decided the manner in which monetary payments will be made and determined that restitution will be joint and several with the other co-defendants. *See* ECF No. 268 at 7. All that remains is to determine the restitution amounts.[1]

### Undisputed Restitution

The restitution calculations for several transactions are undisputed and so do not require extended analysis.

1. **1732 Unionport Road**

The parties agree that the proper restitution amount for this property is $30,763.13 and should be paid to HUD as indemnitor of M&T Bank. *See* ECF No. 294 at 7; ECF No. 309 at 8-9.

Accordingly, for restitution purposes, HUD has suffered a loss of $30,763.13. Savedoff is ordered to compensate HUD via monetary payment.

2. **949 East 231st Street**

The parties agree that the proper restitution amount for this property is $97,222.92 and should be paid to HUD as indemnitor of Suntrust Bank. *See* ECF No. 242 at 4; ECF No. 294 at 8.

---

[1] At the hearing and in its briefing, the government asserted that the parties' dispute is one of law, not fact. *See, e.g.*, ECF No. 311 at 3. While it may have begun as a legal dispute, in subsequent briefing it has come to embrace factual as well as legal arguments. Moreover, having received the evidence underlying the government's restitution calculations—much of which is insufficient for the reasons discussed below—the Court will not ignore it and limit its analysis to the parties' original dispute of law.

Accordingly, for restitution purposes, HUD has suffered a loss of $97,222.92. Savedoff is ordered to compensate HUD via monetary payment.

### 3. 3985 Carpenter Avenue

The parties agree that the proper restitution amount for this property is $122,819.25 and should be paid to Citibank. *See* ECF No. 242 at 4; ECF No. 294 at 12.

Accordingly, for restitution purposes, Citibank has suffered a loss of $122,819.25. Savedoff is ordered to compensate Citibank by monetary payment. Furthermore, to the extent Savedoff makes a partial payment, Citibank will receive priority over HUD. *See* 18 U.S.C. § 3664(j)(1) (stating that restitution must first be paid to victims before insurers or other providers of compensation).

## Disputed Restitution

### 4. 4087 Edson Avenue

The government argues that the loss to M&T Bank, the original lender, for this property is $22,734.37, which is the outstanding principal loan balance ($637,734.37) minus the 2018-2019 fair market value of the property ($615,000). ECF No. 309 at 20. Savedoff responds that no restitution is owed, because the outstanding principal balance ($637,734.37) is less than the proposed sale price of the property ($700,000). *See* ECF No. 294 at 7.

The Court orders restitution to M&T Bank in the amount of the unpaid principal balance: $637,734.37. *See United States v. Luis*, 765 F.3d 1061, 1067 (9th Cir. 2014) ("The restitution formula . . . begins with the amount of the unpaid principal balance due on the fraudulent loan.").

The Court orders that this restitution be paid via an in-kind payment/credit as contemplated under *Robers* and *Nawaz*. Specifically, Savedoff will receive credit towards restitution owed if M&T Bank either obtains the property as part of the foreclosure process or is paid the loan amount

6

as part of the impending sale. *See* ECF No. 303 (discussing potential sale of property). Because, in either scenario, M&T Bank's loss will likely be fully satisfied, the Court will not order Savedoff to make any payments beyond the in-kind payment/credit.[2]

**5. 814 Faile Street**

The government asserts that the loss to M&T Bank for this property is $103,308.23—the outstanding principal loan balance ($570,308.23) minus the 2018-2019 fair market value of the property ($467,000). ECF No. 242 at 4. Savedoff argues that no restitution is owed, because the outstanding principal balance ($570,308.23) is less than the current fair market value of the property ($639,000). *See* ECF No. 294 at 8.

This property is in foreclosure proceedings. Because M&T Bank has neither received the collateral nor obtained the proceeds from its sale, the restitution amount is the full amount of the unpaid principal balance: $570,308.23. The Court orders restitution in that amount.

However, the Court orders that restitution be paid via an in-kind payment/credit. Savedoff will receive credit towards restitution owed once M&T Bank obtains the property as part of the foreclosure proceedings or recovers proceeds from the sale of the property. Given that the current fair market value of the property exceeds the unpaid principal balance, the Court will not order Savedoff to make any payments beyond the in-kind payment/credit.

**6. 1728 Unionport Road**

This property requires more explanation. As part of the scheme in which Savedoff was involved, Jimmy Isaac purchased the property in Fall 2008. The recorded mortgage shows a

---

[2]Although the most recent tax assessment records suggest that the property's value is less than the remaining loan balance, *see* ECF No. 294-1 at 1, the contemplated sale price exceeds the loan balance. *See* ECF Nos. 284, 303. Therefore, Court does not expect that M&T Bank will retain any loss after disposition of the property.

7

principal loan balance of $569,415. Gov't Ex. 26. At some point, Bank of America obtained the loan and in February 2015, it executed a loan modification agreement with Isaac. Gov't Ex. 25. Pursuant to that modification, the principal loan balance was reduced to $318,250.

The government now seeks restitution for Bank of America in the amount of $251,165—*i.e.*, the loss attributable to the loan modification. It argues that the loan modification was "a reasonably foreseeable event" resulting from Savedoff's wrongful conduct. ECF No. 309 at 15. Savedoff contends that restitution to Bank of America is not proper because, *inter alia*, the government has not proven the nature or extent of Bank of America's loss. The Court agrees with Savedoff.

The government bears "the burden of establishing the victim's actual loss by a preponderance of the evidence." *United States v. Goldberg*, 661 F. App'x 33, 36 (2d Cir. 2016) (summary order). This burden "requires only a reasonable approximation of losses supported by a sound methodology." *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013) ("[D]ifficulties in achieving exact measurements will not preclude a trial court from ordering restitution.").

Mollie Brewster, the government's forensic accountant, testified at the restitution hearing. She stated that after Isaac purchased the property, the loan was transferred by several entities. The Funding Source transferred the loan to M&T Bank, which transferred it to Countrywide. ECF No. 298 at 34, 41. The loan was then transferred to Bank of America. Critically, Brewster testified that Countrywide had received the loan from M&T Bank as part of a loan sale, but she had no information as to the sale price. ECF No. 300 at 9, 10. She also did not know the amount that Isaac had paid towards the loan. *See* ECF No. 298 at 47; ECF No. 300 at 52. Instead, Brewster used the original loan balance to determine the loss caused by the loan modification. ECF No. 298 at 29.

8

The government's methodology was erroneous. "Where a mortgage is held by a successor lender, the appropriate measure of value is the purchase price, not the remaining loan balance." *Brown*, 2016 WL 11263165, at *8. This is because downstream purchasers "could have paid less than the unpaid balance to acquire the notes." *United States v. Howard*, 784 F.3d 745, 750 (10th Cir. 2015).

Because Bank of America is a successor lender, the government erred when it calculated loss based on the unpaid balance without accounting for the price Bank of America (or Countrywide) paid for the loan. Furthermore, the government was unable to obtain information as to the amount Isaac paid on the loan, which would further reduce Bank of America's loss. Given these errors and evidentiary gaps, the government has failed to offer a reasonable approximation of Bank of America's loss based on a sound methodology. *See Brown*, 2016 WL 11263165, at *11 (denying restitution to secondary loan purchaser where government offered "no evidence of the price [the purchaser] paid to acquire the loan").

No restitution will be ordered as to the 1728 Unionport transaction.

7. **823 East 218th Street**

This property also has a more complicated transaction history. In Fall 2008, co-defendant Daniel Badu purchased the property through a mortgage obtained by fraud and misrepresentation. Savedoff was the settlement attorney for the transaction. Metlife was the original lender, but the loan was soon sold to several downstream purchasers. The exact chain of title is unclear.

At the hearing, Brewster described the evidence the government had received from lenders. That evidence largely consisted of informal emails between the government and the lenders, as opposed to signed affidavits or formal contracts. The only documentation the government

9

proffered was a spreadsheet from JPMorgan Chase, which showed its record concerning the loan. *See* Gov't Ex. 21.

Based on this evidence, the government alleges the following: In January 2013, the unpaid principal on the loan was $684,278.33. *Id.* In April 2013, Metlife sold the loan to JPMorgan Chase for $316,478.73, resulting in a loss to Metlife of $367,799.60. ECF No. 298 at 24. In October 2014, JPMorgan Chase sold the loan to Varde Partners for $307,251.16, resulting in a loss to JPMorgan Chase of $9,227.57. In November 2018, Varde sold the loan to Preston Ridge, resulting in no loss to Varde.

As Savedoff points out, however, public property records portray a different series of transfers. ECF No. 294 at 10-11. In September 2013, Metlife assigned the mortgage to JPMorgan Chase. In February 2016—over one year after it reportedly sold the loan to Varde—JPMorgan Chase assigned the mortgage to Wilmington Trust, N.A. In January 2019, Wilmington Trust assigned the mortgage to U.S. Bank.

Savedoff also notes that Metlife did not sell the loan to JPMorgan Chase as part of an ordinary sale in the secondary market. Rather, as the government acknowledged at a hearing before United States District Judge Lawrence J. Vilardo, Metlife "[got] out of the mortgage business and sold its book of business to JPMorgan Chase." *United States v. Badu*, No. 16-CR-45, ECF No. 28 at 7. The government does not know how Metlife and JPMorgan Chase valued Badu's loan as part of that transaction. *Id.* at 7-8.

It is the government's burden to prove by a preponderance of the evidence that a putative victim "(1) satisfies the statutory definition of a victim and (2) has suffered an actual loss as a result of the defendant's criminal conduct." *Brown*, 2016 WL 11263165, at *5. To be a victim, one must be proximately harmed as a result of the commission of the offense. *Id.*

10

As a general matter, a reasonably foreseeable consequence of a fraudulent mortgage scheme—whereby an unqualified borrower obtains a home loan—is default. *See United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010). Thus, the unpaid principal balance of the loan is a foreseeable, proximate loss of a fraudulent mortgage scheme. *See id.* Likewise, in light of the "common industry practice of selling loans on the secondary market," it is foreseeable that secondary loan purchasers may be harmed by the scheme. *United States v. Cean*, 771 F. App'x 81, 83 (2d Cir. 2019) (summary order); *see also Luis*, 765 F.3d at 1068 (noting that "selling defaulted loans" is a "very common method of mitigating loss" and is therefore foreseeable).

That being said, liability is not without limit. The case of *United States v. Brown*, No. 11-CR-449, 2016 WL 11263165 (E.D.N.Y. Dec. 2, 2016), is illustrative. There, the government sought restitution for a secondary purchaser of a fraudulently obtained mortgage loan. *See id.* at *11. The government requested "out of pocket expenses associated with maintenance and foreclosure" of the property. *Id.* The district court denied restitution. It noted that at the time of foreclosure, the purchaser could have sold the property for an estimated $380,000—well in excess of its losses. *Id.* But, because of an incorrectly recorded deed, the purchaser did not sell the property. The court reasoned that the error "was wholly unforeseeable," and it also noted that it "was further unforeseeable that for six years [the purchaser] would fail to correct the error or otherwise sell the property." *Id.* Accordingly, the court concluded that any losses were not attributable to "Defendants' wrongful actions." *Id.*

This case involves a similarly tenuous link between the alleged loss and the wrongful conduct. Because the sale of Badu's loan from Metlife to JPMorgan Chase was not in the ordinary course of business, it is unclear whether the loss Metlife sustained was in any way related to Savedoff's conduct. At the hearing before Judge Vilardo, the government conceded that it did not

11

know how Metlife negotiated the sale price of Badu's loan or its mortgage portfolio more generally.

Without more evidence, the Court is left to speculate. It could be that Metlife offered its portfolio at a discounted rate for other business reasons unrelated to the perceived value of its loans. Perhaps Metlife was willing to take a large loss in order to easily offload its portfolio and leave the lending business. If that were the case, ordering restitution would violate the basic principle that the restitution statute "does not permit awards in excess . . . of the victim's loss." *Boccagna*, 450 F.3d at 117 (internal quotation marks and brackets omitted). It would be akin to awarding restitution to a victim who had disposed of collateral for a nominal sum to an associate: the victim receives the double benefit of full restitution and the gift of collateral. *See, e.g.*, *Robers*, 572 U.S. at 646 (stating that the causal connection between a fraudulent mortgage scheme and the lender's loss breaks if the lender sells the collateral "to a friend for a nominal sum"); *Boccagna*, 450 F.3d at 117. Ultimately, the Court cannot conclude one way or another why Metlife sold Badu's loan or whether its loss was traceable to Savedoff's conduct. The Court therefore declines to award restitution to Metlife.

The remaining loan transfers suffer from a similar problem. The government's evidence consists of some emails and a single-page spreadsheet. The government did not present any sworn affidavits or more formal documentation to establish the sales to Varde and Preston Ridge. One would expect that such documentation would be readily available in a sophisticated and document-heavy industry like the secondary loan market. Instead, the government presents a few emails with no supporting proof.

The lack of supporting proof is especially concerning here, given that the chain of title the government describes is inconsistent with the mortgage assignments found in public records,

12

which identify neither Varde nor Preston Ridge. The public records show an assignment from JPMorgan Chase to Wilmington Trust, not Varde. It may be that all these dots can be connected in a consistent manner, but the government makes no attempt to do so.

This is not to say that the government's evidence is legally insufficient; rather, it is factually unpersuasive. While the Court appreciates that the government may have had some difficulty obtaining documents from the putative victims, that does not relieve the government of its burden. Furthermore, there is "no public interest served by requiring that restitution be paid to an alleged victim who declines to cooperate in providing the evidence necessary to establish its loss." *Howard*, 784 F.3d at 752.

For these reasons, no restitution will be awarded for the 823 East 218th Street transaction.

## 8. 816 Faile Street

JPMorgan Chase was the lender for the transaction concerning 816 Faile Street and is therefore the victim under the MVRA. The parties agree that the unpaid principal loan balance is approximately $575,801.61. *See* ECF No. 253 at 6; ECF No. at 294 at 10. Probation indicates that the property is in foreclosure proceedings and there is a pending short sale.[3] ECF No. 314 at 1. Based on this year's tax assessment records, the fair market value of the property is $639,000. *See* ECF No. 294-1 at 22. The wrinkle as to this property is that the owner intends to sell the property by short sale for $150,000. ECF No. 314 at 2. JPMorgan Chase would need to consent to the sale. *Id.* If the short sale is accomplished, JPMorgan Chase would incur a loss equal to the unpaid balance minus the short-sale proceeds.

---

[3] Previously, the parties were under the impression that JPMorgan Chase had already foreclosed on and taken possession of the property. *See* ECF No. 263 at 39. After the restitution hearing, the parties and the Court learned that JPMorgan Chase had not completed foreclosure proceedings. *See* ECF No. 314. The Court permitted, but did not require, the parties to file supplemental memoranda on this development, but neither party did so.

13

As with some of the other loans at issue, the Court concludes that the government has not established the causal link between Savedoff's wrongful conduct and JPMorgan Chase's alleged losses. Granted, for restitution purposes, there was originally a sufficient connection between the fraudulent mortgage scheme and the money JPMorgan Chase lost through its lending. But with the passage of time, and given the scant record before the Court, that connection is no longer tenable. Based on the few payments made on the loan, the owner has apparently been in default for a number of years—perhaps even a decade. *See* ECF No. 263 at 16.

The extremely long delay between default and foreclosure raises the question of why JPMorgan Chase has taken so little action on this loan, and it presents practical problems as the Court attempts to fashion the correct restitution remedy. That is, it makes it difficult for the Court to determine "what [the lender] lost, if any loss associated with the property when it is ultimately sold will be traceable to the original fraud, or if [the defendant is] entitled to any credits against restitution." *Brown*, 2016 WL 11263165, at *13. Faced with similar circumstances, the *Brown* court held that the victim-lender had not suffered an identifiable loss. *See id.* (no loss where lender commenced foreclosure proceedings three years before but failed to explain why proceedings had been completed). The proposed short sale compounds the problem, as the Court is left to wonder why a lender would wait so long to foreclose on a property, and then, once those proceedings are finally initiated, accept a substantial loss instead of recoup the entirety of its loan. The government has not presented enough evidence to allay the Court's concerns.

In light of the dearth of evidence, the Court is not convinced that JPMorgan Chase's loss is fairly attributable to the scheme in which Savedoff was involved. Accordingly, no restitution will be ordered with respect to the loan for 816 Faile Street.

# CONCLUSION

For the foregoing reasons, the Court orders restitution as follows: [4]

| TRANSACTION | ALLEGED VICTIM(S) | RESTITUTION ORDERED (18 U.S.C. § 3663A(b)(1)) | MANNER OF PAYMENT (18 U.S.C. § 3664(f)(3)) |
|---|---|---|---|
| 1732 Unionport Rd. | M&T Bank | $30,763.13 to HUD as indemnitor of M&T Bank | Monetary Payment |
| 949 East 231st Street | Suntrust Bank | $97,222.92 to HUD as indemnitor of Suntrust Bank | Monetary Payment |
| 3985 Carpenter Avenue | CitiBank | $122,819.25 to CitiBank | Monetary Payment |
| 4087 Edson Avenue | M&T Bank | $637,734.37 to M&T Bank | In-Kind Payment to be credited upon liquidation, sale, or receipt of collateral |
| 814 Faile Street | M&T Bank | $570,308.23 to M&T Bank | In-Kind Payment to be credited upon liquidation, sale, or receipt of collateral |
| 1728 Unionport Rd. | Bank of America | No attributable loss; no restitution ordered. | N/A |
| 823 East 218th Street | Metlife, JPMorgan Chase, Preston Ridge | No attributable loss; no restitution ordered. | N/A |
| 816 Faile Street | JPMorgan Chase | No attributable loss; no restitution ordered. | N/A |
| | | **TOTAL LOSS:** $1,458,847.90 | **TOTAL CASH PAYMENTS ORDERED:** $250,805.30 **TOTAL IN-KIND PAYMENTS ORDERED:** 2 |

---

[4] The Court notes that its restitution calculations differ in some respects from the loss calculations made for guideline purposes. This is in part due to the distinct formula that is employed for each calculation. It is also due to the fact that the parties' arguments and the factual record has greatly expanded since sentencing. To the extent there are inconsistencies between the guideline and restitution calculations, Savedoff has already acknowledged that any error with respect to the Court's guideline determination is harmless. *See* ECF No. 243 at 3; ECF No. 280 at 3-5.

Further, the Court orders that:

1. CitiBank shall receive first priority before HUD if Savedoff makes a partial monetary payment.

2. As previously ordered in the original judgment, the Court imposes a special condition of supervision requiring Savedoff to notify various parties upon the foreclosure or liquidation of the properties at issue. *See* ECF No. 268 at 5. The Court presumes that the government will notify Savedoff to the extent it learns pertinent information regarding the status of those properties, but it is ultimately Savedoff's responsibility to ensure that he receives credit upon disposition of the properties.

3. The Clerk of Court shall issue an amended judgment consistent with this Order.

   IT IS SO ORDERED.

Dated: November 20, 2019
       Rochester, New York

                                             HON. FRANK P. GERACI, JR.
                                             Chief Judge
                                             United States District Court